UNITED STATES ex rel. PITCAIRN COAL CO. v. BALTIMORE & O.
R. CO. et al.

(Circuit Court, D. Maryland.   June 11, 1907.)

1. CARRIERS—INTERSTATE COMMERCE—DISTRIBUTION OF CARS BY RAILROAD
   COMPANY TO COAL MINES.

   Where some of the operators of coal mines along a line of interstate
   railroad own coal cars individually which are moved by the railroad com-
   pany, they are entitled to the exclusive use of such cars, but in times
   when the total supply of coal cars, including such individual cars and
   those owned by the railroad company, is insufficient to meet the demand,
   in the distribution by the railroad company of cars between the different
   mine operators on a percentage basis, calculated on the production of
   the several mines, each operator is entitled to its percentage of all of the
   available cars, whether owned by the company or individually, in so far
   as it will not interfere with such right of the individual owners to the
   exclusive use of their own cars, and the action of the railroad company
   in deducting such individual cars before making the distribution and al-
   lowing their owners in addition thereto their full quota of its own cars
   subjects other operators who own no cars to an undue and unreasonable
   prejudice and disadvantage, in violation of section 3 of the interstate
   commerce act of February 4, 1887 (24 Stat. 380, c. 104 [U. S. Comp. St.
   1901, p. 3155]).

   [Ed. Note.—Duties and liabilities of carriers as to furnishing facilities
   for transportation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C.
   C. A. 414.]

2. SAME.

   In such a distribution the allotment of an arbitrary number of cars
   for development to new mines which have had no opportunity to establish
   a percentage within reasonable limits is lawful.

3. SAME.

   The practice of a railroad company in distributing coal cars for use
   between mine operators on its line in times of shortage of cars not to
   charge against a mine as a part of its quota cars of other railroad com-
   panies who had bought coal for fuel from such mine and sent the cars
   there to receive delivery of the same, when the coal so sold is not taken
   into consideration in computing such mine's percentage, does not subject
   other mine operators to an undue or unreasonable prejudice or disad-
   vantage in violation of section 3 of the interstate commerce act of Feb-
   ruary 4, 1887 (24 Stat. 380, c. 104 [U. S. Comp. St. 1901, p. 3155]).  The
   same considerations apply to coal purchased by any buyer for its own
   use to be delivered into its own cars at the mine, and which does not
   become a subject of interstate commerce.

4. SAME.

   Nor is the statute violated by the allowance by the railroad company
   of an extra percentage of cars to an operator which during the preceding
   month has unloaded and returned its cars within a certain average time;
   such practice having been adopted instead of the imposition of a demur-
   rage charge to encourage prompt return of cars, and enlarge the available
   supply for use, and being open to all alike.

5. SAME.

   The method adopted by a railroad company for fixing the percentage
   of cars to which the several coal mines on its line in a certain district
   were entitled in distributing cars between them in times of shortage,
   by taking the actual shipments made from each mine during the season
   when there was a full supply of cars and also the possible output of
   such mine and making an average, counting the former as two units and
   the latter as one, held not discriminative as against the newer mines.

Petition for Mandamus.

Frederick Dallam and William A. Glasgow, for relator.

John G. Wilson and Hugh L. Bond, Jr., for Baltimore & Ohio Railroad Co.

Edgar H. Gans and Charles Markell, for defendants Cumberland & Pennsylvania R. R. Co., the Fairmont Coal Co., and certain others.

MORRIS, District Judge.   This petition for mandamus, to require the Baltimore & Ohio Railroad Company to cease from subjecting the relator and other coal companies on the Monongah Division to undue and unreasonable discrimination in the shipping and transportation of coal, was filed January 16, 1907, by the relator, the Pitcairn Coal Company, a corporation of West Virginia, against the Baltimore & Ohio Railroad Company and the Cumberland & Pennsylvania Railroad Company and 37 coal companies, most of them operating mines in West Virginia in what is known as the "Fairmont region."   Of the defendants the Fairmont Coal Company, the Clarksburg Fuel Company, the Pittsburgh & Fairmont Fuel Company, the Southern Coal & Transportation Company, the Consolidation Coal Company, and the Somerset Coal Company are allied companies, practically all controlled by the Consolidation Coal Company, which also owns substantially all the capital stock of the Cumberland and Pennsylvania Railroad Companies.   The majority of the stock of the Consolidation Coal Company until May, 1906, was owned by the Baltimore & Ohio Railroad Company, and was then sold by the Baltimore & Ohio Railroad Company to Clarence W. Watson, acting for himself and his associates; the railroad company retaining a lien for a portion of the purchase money.   The allied companies are referred to as the "Fairmont Companies," and the other coal companies operating in the Fairmont region of West Virginia are spoken of collectively as the "independent companies."   The Baltimore & Ohio Railroad Company has fully answered the petition, denying all allegations of undue preference or discrimination, and the Fairmont Companies have fully answered, denying any discrimination in their favor.   Thirteen other defendants have answered, asking the same relief as prayed by the relator, and others of the defendants who were summoned have not intervened in any way.   The case coming on to be heard, a jury was waived, and it was agreed by a stipulation in writing that the issues of fact should be tried and determined by the court without the intervention of a jury.

The Pitcairn Coal Company, the relator, owns a tract of about 1,000 acres of coal land near Clarksburg, W. Va., and has been operating a mine there since 1903 in what is known as the "Monongah district," on the West Virginia & Pittsburgh Railway, which railway belongs to and is operated by the Baltimore & Ohio Railroad Company as part of its railroad system.   The Pitcairn mine has an eight-foot vein of good bituminous steam and gas coal, with working places for 208 miners, is well equipped with electric cutting machines, and is rated by the railroad company as having a possible physical capacity of mining 1,600 tons per day.   The relator invokes the action of this court

under section 10 of the act to regulate commerce (Act March 2, 1889, c. 382, 25 Stat. 862 [U. S. Comp. St. 1901, p. 3172]), as follows:

"Sec. 10. That the Circuit and District Courts of the United States shall have jurisdiction upon the relation of any person or persons, firm, or corporation, alleging such violation by a common carrier, of any of the provisions of the act to which this is a supplement and all acts amendatory thereof as prevents the relator from having interstate traffic moved by said common carrier at the same rates as are charged, or upon terms or conditions as favorable as those given by said common carrier for like traffic under similar conditions to any other shipper, to issue a writ or writs of mandamus against said common carrier, commanding such common carrier to move and transport the traffic, or to furnish cars or other facilities for transportation for the party applying for the writ: provided, that if any question of fact as to the proper compensation to the common carrier for the service to be enforced by the writ is raised by the pleadings, the writ of peremptory mandamus may issue, notwithstanding such question of fact is undetermined, upon such terms as to security, payment of money into the court, or otherwise, as the court may think proper, pending the determination of the question of fact: provided, that the remedy hereby given by writ of mandamus shall be cumulative, and shall not be held to exclude or interfere with other remedies provided by this act or the act to which it is a supplement."

The provisions of the act which the relator complains is being violated by the railroad company in favor of the Fairmont Coal Companies are set forth in section 3 as follows:

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and for the receiving, forwarding, and delivering, of passengers and property to and from their several lines and those connected therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

The complaint of the relator is thus formulated in its petition:

"(7) Relator shows that the capacity of its mine at Clarksburg, West Virginia, aforesaid, is one thousand (1,000) tons of coal per day, and that if cars are received by it to load the same that it can and would load as much as one thousand (1,000) tons per day for shipment over the said Baltimore & Ohio Railroad, but it has never been able to get the cars sufficient to ship that amount of coal, and it has been unable to ship sufficient coal to fill contracts which it has and has had on hand, and has been unable to take certain valuable contracts for the delivery of coal which were offered to it, because of its inability to get a sufficient supply of cars from the Baltimore & Ohio Railroad Company in which to ship the same. * * *

"Relator further shows that it has frequently made within the last three months, and prior thereto, reasonable requests for cars to fill its contracts and to enable it to take valuable contracts which were offered, but the Baltimore & Ohio Railroad Company refused, declined, or failed to furnish to it such cars and other vehicles, instrumentalities, and facilities for shipping coal as were needed by relator in order to fill its contracts, or to ship the coal which was required by it under its obligations to persons whom it had sold coal, and to enable it to take the valuable contracts aforesaid. * * *

"Relator further charges that the Baltimore & Ohio Railroad Company has declined to give to relator the cars for carrying coal from its mines to which it was justly and property entitled, as hereinafter more particularly set forth, and, further, that the Baltimore & Ohio Railroad Company, as hereinafter more particularly set forth, has given an undue and unreasonable preference or advantage to other persons, companies, firms, and corporations, as hereinafter more specifically set forth, in its distribution and assignment of cars for service and shipments from the coal mines and coal operations along its line of road and further, and the Baltimore & Ohio Railroad Company, as hereinafter more specifically set forth, has subjected relator and the other independent coal operators, defendants to this petition, to undue or unreasonable prejudice or disadvantage in its system of car distribution, and in service to the coal mines owned and operated by relator and such independent coal companies.  * * *

"(8) Relator further says that when the supply of cars is sufficient on the Baltimore & Ohio Railroad that all orders for cars are filled, but that this condition of affairs rarely exists except for a few months of the year in the summer time, but, whenever in any district the supply of cars is insufficient to fill all orders, cars are supposed to be distributed, and the Baltimore & Ohio Railroad Company alleges that it has distributed such cars, on a percentage basis, to all of the mines in such district, but in the distribution of cars on a percentage basis, before distribution is made, certain arbitrary assignments of cars are made reducing the total number of cars to be distributed, on the percentage basis aforesaid, as follows: First. All cars placed at mines for the fuel or supply coal of the Baltimore & Ohio Railroad Company are not charged against the percentage to which the mines furnishing such coal are entitled.  Second. New mines are allotted an arbitrary number of cars, daily or weekly, for development.  Third. When foreign railroad companies—that is, companies other than the Baltimore & Ohio Railroad Company—send their own cars for fuel or supply coal to mines on the Baltimore & Ohio Railroad, such cars are treated as arbitrary, and are not charged against the percentages of the mines to which they are sent.  Fourth. Cars owned by individual companies or operators, and commonly known as 'individual cars,' are placed at mines of the owners for shipment of their coal, and are not charged against percentages of such mines.  Fifth. Whenever a shipper on the Baltimore & Ohio Railroad ships cars to Curtis Bay, a tidewater terminal of the Baltimore & Ohio Railroad, and such cars are handled promptly in any one month, such shipper is allowed in the succeeding month a premium of fifty (50) per cent. of the number of cars so shipped, in addition to his regular percentage.  Sixth. At certain points, which are noted on the sheets of the Baltimore & Ohio Railroad Company, showing a distribution of cars on a percentage basis, an arbitrary number of cars is assigned to mines on fire.  Seventh. Certain mines in the immediate vicinity of industrial plants are given an arbitrary allotment of cars which are empty and are intended for loading at such industrial plants, if the cars when loaded with coal are to be consigned to such industrial plants.  Eighth. When annual contracts are placed for foreign railroad fuel or supply coal with mines on the line of the Baltimore & Ohio Railroad, and cars are furnished by such foreign road for shipment of such fuel or supply coal, then the Baltimore & Ohio Railroad Company allots to the mines shipping such coal an arbitrary allotment of cars out of its equipment equal to the foreign cars furnished for such fuel or supply coal.  After the foregoing arbitrary cars are allotted and assigned to the mines on the Baltimore & Ohio Railroad, the remaining cars it is claimed by the Baltimore & Ohio Railroad Company are divided among all the mines or operators, including those enjoying the arbitrary allotment of cars aforesaid, on the percentage basis.  * * *

"The above is the system of distributing cars as claimed by the Baltimore & Ohio Railroad Company on the Monongah Division of said road as above set forth, and relator charges that all such exceptions, limitations, and rules are made to the undue advantage of and in preference of certain coal companies and shippers as herein set forth, in the prosperity of which the Baltimore & Ohio Railroad Company is interested.  * * *

"The Baltimore & Ohio Railroad Company claims to distribute cars on the several divisions of its road to coal mines on a capacity basis; that is, the capacity of the mine is supposed to be arrived at by taking into consideration (1) physical capacity of the mine; (2) previous shipments therefrom. And from this capacity a percentage is worked out for each mine of the cars for distribution on that division, in comparison with the capacity of the other mines on said division, and the assignment of cars to each division is worked out by arriving at the percentage of the equipment to which such division is entitled in comparison with the capacity for shipping coal of all the mines on the other divisions of said road."

Of the foregoing enumerated grounds of complaint there are three which have not been urged at this hearing, viz., the second, sixth, and seventh.

### Individual Cars.

Of the enumerated grounds of the complaint relied upon the first is the most important. It is that when the supply of coal cars for the mines is less than the needs of the mine operators, and when from day to day the car supply is apportioned among the mines on a percentage basis, all the cars sent to certain mines are not counted as part of their percentage allotment. This arises from the fact that many of the coal companies operating in the Fairmont region and controlled by the Fairmont Company have individual coal cars of their own. This system of ownership by coal companies of individual cars began in 1852, more than half a century ago, and these individual cars have never been considered or taken into account by the railroad company in making a pro rata division of the coal car equipment when the supply of coal cars was not sufficient to meet the demands of all the mine operators. It is not contended in this case that the equipment of coal cars provided by the Baltimore & Ohio Railroad is not reasonably sufficient for their coal trade on the yearly average of the seasons. It is not in this proceeding claimed to be reasonable that of cars usable solely for the transportation of coal, the demand for which is not constant during the year, the railroad should furnish sufficient for the maximum demand. Their equipment of coal cars has been recently largely added to and is now for about seven-twelfths of the year ample to supply the demands of the mine operators. But during the remaining five-twelfths of the year, embracing the winter months, the demand for coal cars is on most days greater than can be furnished. Then it is that a percentage of the whole number available is allotted to each mine.

The business of mining, transporting, and selling of bituminous coal is peculiar. The mine operator, as a rule, has no means whatever of storing the coal. It must be dumped from the mine cars directly into the railroad cars, and taken by the purchaser at its destination in those cars directly to the place where it is to be consumed, or to the vessels in which it is to be further transported by water carriage. This makes the railroad cars the place of storage for the coal from the mouth of the mine to the premises of the consumer or to the ship's side, if it is to be water borne, or until a purchaser is found, if the consignee has not a purchaser ready when the car arrives at the point of destination, and, as there is no place of storage at the mine, the cars must be sup-

plied daily to receive the coal as mined. The difficulties resulting from the irregularity of the demand for coal between winter and summer, the difficulties resulting from its being a commodity which usually cannot be stored, and the fact that many of the large consumers require the coal dealer to contract to deliver them a daily and never-failing supply has induced certain mine operators having large capital to increase their equipment of individual cars, and this has been availed of by the Fairmont Company to a very large extent, so that the Fairmont Company and its allied companies have now running regularly on the Baltimore & Ohio Railroad some 5,500 individual cars, many of them of 50 tons' capacity. These allied companies have, also, for the purpose of increasing the sales of the output of their mines and providing constant use for their individual cars, acquired large terminals on Western lake ports and terminal facilities at seaboard ports in New England, and vessels and barges to carry coal between Curtis Bay and New England, and this has introduced their coal into new markets and greatly increased their business. The complaint of the relator is not that the railroad company permits the exclusive use by their owners of the individual cars, but that by the system of car distribution when there is a shortage, as practiced by the railroad company, there is produced an undue and unreasonable preference in favor of the owners of individual cars, and the relator and others in like situation are subjected to undue and unreasonable prejudice and disadvantage. By a method of calculation, which will be mentioned later, each mine in the district is given by the railroad officials a fixed percentage, based on its capacity to ship coal, and which is intended to be its proportion of the whole output of all the mines in the district. When the available car supply for the day is less than the demand, the mine is entitled to get that percentage pro rata of the whole available supply of coal cars belonging to the railroad company.

The complaint of the relator is that from the whole available supply of cars in the district on which the percentage is calculated there is first deducted and given to each mine its own individual cars, and then, besides, it also gets its full percentage allotment of the remaining Baltimore & Ohio Railroad cars, and that this system produces results which are very prejudicial to the mine having no individual cars, and which are made evident in many ways: First, that the railroad's tracks, engines, and operating force are taxed by handling so great a number of individual cars, so that the car supply comes to the mine late in time and irregularly and uncertain in numbers, with the result that the independent mines are constantly idle, and the force of miners, who are paid by the ton and who cannot work for want of railroad cars to receive the coal, become discouraged and leave; also, as the percentage of the mine is rated in large part by its actual output, its development and consequent percentage rating is kept from increasing, and the whole enterprise is held in check; also, that on account of the limited and uncertain and varying car supply it is not reasonably possible for the independent operators to enter into any contracts to ship coal during the winter months when the demand is greatest and the prices highest. In the month of November, 1906, which was a month of average winter car supply, and in which the

relator could reasonably have loaded 20 cars a day, and needed 20 cars a day to keep its miners and other employés from losing time, and had notified the railroad that it required at least 20 cars a day, making in all over 600 for the month, it received only 183 cars, and these were received very irregularly, viz., on four days none, on many days only one or two or three, making 18 days on which less than 10 were received. During the month there were a few nonpercentage days, usually Mondays, when the car supply was adequate, and on these days the relator's mine received and loaded very nearly its full capacity.

It would not be reasonable to hold that the exclusive use of individual cars by the mine operators under a system which has grown up during half a century and under which the trade has enormously developed, and upon the faith of which mine operators have invested millions of capital, often at times when the railroad company had neither money nor credit with which to increase its equipment, is now to be denied unless it could be done upon fair terms mutually acceptable to the mine operators and the railroad. The use of individual coal cars is not peculiar to the Baltimore & Ohio Railroad, but has been quite generally used from the beginning of the coal trade in the United States and in England. While it is true that, if the railroad was so disposed, it might by not keeping up its coal car equipment gradually force all mine operators to provide individual coal cars, which would in the end leave in the business only those operators who were able to obtain and profitably use the large capital required to purchase individual cars, it does not appear that the railroad has pursued that policy. On the contrary, in 1905 it ordered 5,000 new coal cars of large capacity, increasing its total coal car equipment to about 45,000, and also increased its engine equipment so that it is abundant. Under the present system of individual ownership of coal cars it is not unreasonable that the owner shall have the exclusive use of his individual cars; on the contrary, it is only just. But, under the actual circumstances of the business of the coal trade on the Baltimore & Ohio Railroad, from which it is apparent that the great struggle of the mine operators is to get sufficient cars to ship their product during the winter months, and that their business existence depends upon it, it is not unreasonable to hold that the railroad shall do all that it is practicable to do to avoid subjecting the operators who do not have the use of individual cars to unreasonable disadvantage. While it is true that the existence in the trade of a large number of individual cars does increase the total car equipment, and so far as the individual cars satisfy the requirements of their owners does increase the number of free equipment cars which the railroad has at its disposal, it still is a fact that in times of car shortage the demand is so great that all the mines having individual cars require and get their full percentage of the railroad's equipment without reference to their own cars.

Under the provisions of the interstate commerce act the railroad must abstain from giving any undue or unreasonable preference or advantage to any mine owner in any respect whatsoever. The duty of the railroad under section 1 is to furnish transportation upon reasonable request. It is not the duty of the shipper, but of the railroad, to provide the required vehicles of transportation. If, for convenience

or of necessity, the vehicles are furnished by certain of its shippers, and are run regularly on the road just as its own equipment is run, they are, I think, to be treated for some purposes as part of the equipment of the road. These regularly run individual cars occupy the tracks and sidings. They are drawn by the locomotives, and are operated by the employés of the railroad company, and must lessen the facilities in that respect of the independent operators. Indeed, an objection of the railroad company to individual ownership of cars is that they require special switching and special care to collect and classify them in order to haul them to their respective destinations. As the independent mine operators have in this manner to suffer from individual cars being transported as part of the railroad's equipment in such large and constant numbers running regularly on the railroad's lines, it seems only reasonable that, when distribution upon percentage is made, all this regular equipment then available should be taken into the calculation, and not to first deduct the individual cars and give the independent mine operators only their percentage of the remaining available equipment. This taking of individual cars into calculation would not be depriving the individual car owner of the exclusive use of his cars, and it would not be depriving him of any contractual right which he is entitled to retain and enjoy under the interstate commerce act. The mine operator would in any state of the car supply continue to get the exclusive use of his individual cars as before, but, when the supply was short, he would not get so many of the railroad's general equipment. It would be rectifying an unreasonable disadvantage which has been shown to work a serious hardship upon the relator and the independent mine operators in the Fairmont region.

Against the relator's contention in favor of taking individual cars into account in dividing the available car supply according to the percentages, it is urged, on behalf of those resisting the writ, that the question has been adjudicated in favor of the present system in two cases, viz., Fairmont Coal Company v. Baltimore & Ohio Railroad Company,[1] instituted March 12, 1903, in the United States Circuit Court for the Northern District of West Virginia, in equity, in which a hearing was had on bill and answer and a decree entered March 23, 1903, adjudging that the Fairmont Company was entitled to the exclusive use of its individual cars in addition to its proper pro rata share of all other cars of the railroad company's general equipment and car supply. It is to be noticed that this decree was entered on bill and answer in a case solely between the Fairmont Coal Company and the railroad company to which no other shippers of coal were parties or had the opportunity to be heard. It therefore does not conclude the rights of the relator. The other case is Riverdale Mining Company v. Baltimore & Ohio Railroad Company[1] in the United States Circuit Court for the Southern District of Ohio in 1906. This was a suit for damages, claiming that the Baltimore & Ohio Railroad Company had discriminated in favor of the Fairmont Coal Company and against the Riverdale Mining Company (the plaintiff in that case) in the distribution of coal cars, in violation of the interstate

[1] No opinion filed.

commerce act. The court instructed the jury that the individual cars belonging to the Fairmont Company were not to be considered in computing the cars which it was the duty of the railroad company to distribute regularly among the mines of the Monongahela Division. This case also was one to which the relator was not a party, and with the greatest respect for the ruling of the learned judge who sat in that case, in this case, in which all parties in interest have had the opportunity of a very full presentation of their contentions, I have come to a different conclusion. Under the ruling in the present case it becomes unimportant to inquire under just what contractual terms, as between the railroad and the mine operators, the individual cars are held. Some of these cars have been fully paid for by the railroad company by the working out of the mileage contracts under which they were placed on the road and are now the property of the railroad company, but the mine owners claim that under the contracts they are still entitled to their exclusive use. The exclusive use of other cars now belonging to the Baltimore & Ohio Railroad Company is claimed by virtue of an agreement made with the Monongahela River Railroad Company, the former owner. It is apparent with regard to the cars now the property of the Baltimore & Ohio Railroad Company that these contracts would require careful scrutiny if it was necessary to go into that matter, and it might become a question to what extent the provisions of the interstate commerce act would permit these cars now the property of the railroad company to be taken out of its distributable car supply.

The disadvantageous results of not including the individual cars in the distribution of the car supply is increased by a practice which has grown up, but which does not seem unlawful, of allowing several mines of the same ownership to pool their percentages of cars and to give the whole resultant car supply to one of the mines. This hastens the development of that mine and enables it to gain rapidly an increased percentage, because of its increased shipments, and to effect economies in production.

But there is another practice which has prevailed and which I think should not be indulged. It consists in permitting a mine which is not being worked to retain its percentage, and to give it to another mine in the same ownership. This was originally done upon the expectation that the mine not working was only closed down temporarily and would shortly start up again, but it has been so administered in some cases that mines, which for several years have not been operated, have been allowed their percentage of cars, and have been permitted to give them to other mines in the same ownership.

My finding and ruling is that the relator is entitled to have allotted to it its percentage of all of the available car supply equipment, whether of general or individual cars, and that the relator and those in like situation with it are subjected to an unreasonable disadvantage by getting only a percentage of the free Baltimore & Ohio equipment, after having first eliminated therefrom the individual cars. But in no case are the owners of the individual cars or those entitled to them by contract to be deprived of the exclusive use of their individual cars, but the individual cars assigned by the owner to be loaded at specified mines should be

charged against the specified mine as part of its pro rata distribution of cars.

There remain to be considered the several other grounds of complaint, as to which the relator has invoked the action of the court.

### Arbitrary Allotment of Cars to New Mines for Development.

The second cause of complaint is that "new mines are allotted an arbitrary number of cars for development." The necessity for a reasonable arbitrary allotment to new mines, which have had no opportunity to establish a percentage, is obvious, and it is not now urged by the relator as an unreasonable discrimination against the relator.

### Foreign Fuel Cars.

The third cause of complaint is that, when railroads other than the Baltimore & Ohio Railroad have purchased coal from mines on that road and sent their own cars to the mines for the coal, such cars are not charged against the percentages of the mines to which they are sent. I do not find this to be an unreasonable discrimination against the relator. It is open to all mines alike to sell coal to any railroad that will buy of it, and the coal is sold deliverable on cars at the mine. The foreign railroad having their own cars in which to transport the coal which they buy for their own use send their own cars for that special purpose, and they cannot be used for any other. They are not distributed upon any system whatever, but are sent directly to the mine to be loaded with the coal which the foreign railroad has purchased from it. These cars are never available for commercial shipments, and the coal so shipped is not counted as part of the shipments of the mine in arriving at its percentage rating. Altogether I think it is fair to say that the coal taken from the mines on the foreign railroad cars is in a class different from the ordinary commercial shipments, as to which the law requires that the facilities furnished for transportation shall be without unreasonable discrimination.

### Consumer's Individual Cars.

The same considerations apply also to the transportation of coal purchased at the mines by a consumer who has individual cars of his own to send for the coal. But one such consumer was testified to, viz., the Maryland Steel Company, which has of its own 500 coal cars provided by it in order to insure to it a constant and regular supply of coal of a certain quality needed at its iron works, where, having space and car tracks, it can detain its own cars without penalty as long as it finds convenient. The use of these private coal cars, as is the case with the mine operator's individual coal cars, results in an increased cost of transportation expense to the owner, but the advantages of regularity and control are found by the owners who can successfully use them to offset in their business transactions the increased expense. The need of having a continuous supply of coal of a peculiar quality for use in the furnaces of its iron and steel works creates a necessity which can be best met by having its individual cars, and it is not apparent how these exceptional cars, not great in number, work to the disadvantage of the relator.

### Baltimore & Ohio Fuel Cars.

Similar considerations apply, also, to the purchases of coal at the mines by the Baltimore & Ohio Railroad Company itself, amounting to about 5,000,000 tons a year; the consumption being greatest in the winter time, when the car shortage is most felt. This coal is delivered by the mines from which it is purchased directly onto the engines, tenders, and company's cars, and does not pay freight, and does not enter into interstate commerce. It is consumed by the Baltimore & Ohio Railroad in operating its own lines. It is naturally purchased from the larger mines, having coal of the grade and price used, because they have the capacity to furnish daily the large quantity daily required by the railroad, but the coal so sold is not counted in the shipments on which the percentage rating is based.

### Curtis Bay Premiums.

A further cause of complaint, which is stated in the fifth item of the relator's specification, is what is known as the "Curtis Bay Premium." The Baltimore & Ohio Railroad Company, having provided facilities at Curtis Bay, the railroad's terminal at Baltimore at which coal is dumped from the cars into vessels for ocean transit, found that, when the cars were quickly emptied so that they were released within five days, the cars could make nearly an average of two trips from the mine and return, while they made one round trip to the tide-water terminals either at Philadelphia or New York. To encourage this prompt discharge and return of coal cars, and also the use of its own tracks, the railroad company put in force a rule by which to all shippers or consignors who during a month averaged not more than five days' detention of the cars consigned to them there was granted a premium of 50 per cent. additional to their car supply for the next month. This prompt unloading increases the available car supply; for, if the same car makes more trips, it is equivalent to more cars. It is an opportunity open to all shippers who consign coal to Baltimore for water transportation. It was a question with the railroad management whether they should bring about quick unloading and return of cars by penalty in the nature of demurrage for delay, or by a premium for promptness; and they determined upon the latter. I do not find that this complaint of unfair discrimination is sustained. There is no ground for complaint that the administration of the rule in actual practice results to the detriment of the relator. Indeed, it appears that the Consolidation Coal Company, which ships about 46 per cent. of all the Curtis Bay coal, does not receive the Curtis Bay car premium. The eighth item of the relator's specification charges that for the coal cars furnished by foreign railroads for transportation of the fuel purchased by them the Baltimore & Ohio Railroad makes an arbitrary allotment of an equal number of cars out of its own equipment. The Baltimore & Ohio Railroad by its answer denies that such a practice is now in use, and the proof sustains the answer.

### Method of Ascertaining Percentage Rating.

The percentage rating in 1906 awarded by the railroad company to the relator's mine was 1.71 per cent. of the available car supply. It

is not complained that by the system of computation used by the railroad this was not a correct result, but it is objected that the basis of the computation was not fair, and operates to unjustly discriminate against the relator and those operating the newer mines. The rating is computed about once a year, and is based in part on the actual shipments of the mine and in part on the possible capacity of the mine. The actual coal shipment of each mine is taken from its shipments in the summer season when there is a full supply of cars for every mine, and when, if it has the orders, it can, so far as the car supply is concerned, ship its full capacity. The shipments being thus ascertained, the inspector of the railroad next ascertains by actual examination the physical capacity of the mine—that is to say, the number of working places for miners, the capacity of its tipple, the sufficiency of its appliances—and from these he estimates what would be the possible output of the mine, if it could sell its whole output and was furnished with railroad cars sufficient to ship it. The actual shipments being thus ascertained and the possible capacity thus estimated, the rating is arrived at by an average, counting the actual shipments as two units and the possible capacity as one. The relator complains of this as unfair, in that the actual shipments are given too great importance and the possible capacity of the mine too little, to the injury of the new mines and to the advantage of those long established. It is obvious, I think, from the testimony in this case, that in this particular coal region, where there are many long-established mines, and in which the development of new mines is easy and inexpensive, that there would be no unfairness in taking the actual shipments of a mine in this particular district for two consecutive years as the basis for rating. It might not work to the benefit of new mines, but in any scheme of rating, where there are fully developed mines, actual shipments should have a preponderating influence, and not the possible, but as yet unused, capacity of the mine, which the owners might never be able to find purchasers for. In the case of Kingwood Coal Company v. West Virginia Northern R. R. Co. (C. C.) 125 Fed. 252, affirmed 134 Fed. 198, 67 C. C. A. 220, the three mines in question were like in character and situation, and the distribution was upon an entirely arbitrary method of which the unfairness was apparent. In the present case the method is not arbitrary, and has long been in use, and it is shown by testimony that the physical capacity of the independent mines has in the past four years increased much more rapidly than the physical capacity of the Fairmont mines, which are older and more developed. I cannot find any unfairness in the method of rating complained of.

### Distribution of Cars to the Cumberland & Pennsylvania Railroad.

A cause of complaint urged by the relator is that coal cars of the Baltimore & Ohio Railroad Company's equipment before they reach the Monongah Division of the West Virginia & Pittsburgh Railroad operated by the Baltimore & Ohio Railroad Company are allotted to the Cumberland & Pennsylvania Railroad at its junction with the Baltimore & Ohio Railroad at Cumberland, and that this arbitrary allotment prevents cars coming to the Monongah Division, and gives an undue advantage to shippers on the Cumberland & Pennsylvania

Railroad, to the prejudice of the shippers on the Monongah Division when there is a shortage of coal cars. The coal traffic on the Baltimore & Ohio Railroad began in 1843, and until 1855 was all from the Cumberland region and from mines none of which were located on the Baltimore & Ohio Railroad, but were reached by lateral roads from the mines to the Baltimore & Ohio Railroad at Cumberland and Piedmont. Several of the lateral roads became incorporated in the Cumberland & Pennsylvania Railroad, which practically is a combination and extension of the lateral roads to which, for half a century, the Baltimore & Ohio Railroad has been supplying equipment and by which the coal traffic which is its most important business was started and has been built up. It cannot be maintained that fair treatment to the new coal mines of the Fairmont region which are on the line of the Baltimore & Ohio Railroad requires that the old-established mines on these lateral feeders shall be deprived of the equipment which for half a century has been furnished to them and was being furnished when the relator began operating its mine. The equipment furnished is based on the number of cars the Cumberland & Pittsburgh Railroad has had in previous years, and there is no sufficient evidence to show that it is an unfair allotment and works an unjust discrimination against the relator.

I have indicated on the prayers for rulings on the law my disposition of them, and I have also in the same manner indicated my disposition of the proposed findings of fact.

I desire to express my appreciation of the thoroughness of the preparation and presentation of this case, and of the very great assistance I have derived from the able arguments of counsel and the elaborate and learned briefs submitted in support of their views.

## Conclusion.

My judgment is that the relator is entitled to a peremptory writ requiring the Baltimore & Ohio Railroad Company, in cases of car shortage, in distributing the pro rata shares of the general coal car equipment of the railroad company according to the percentage to which each mine is entitled, to include in the available car supply as the basis of the calculation the individual cars of mine operators regularly used on the Baltimore & Ohio Railroad, not intending, however, to give to the relator, or those in like situation with him, in any event the use at any time of individual cars to the exclusive use of which other mine operators are entitled.

The other items of relief prayed in the petition and set out in the alternative writ are denied.